UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SALLY HILDEN and JEROME FLYNN,

                Plaintiffs                     Case No. 10-12526
                                                    Honorable David M. Lawson

v.

HURLEY MEDICAL CENTER,
VARUNA TEWARI, SHEILA MOORE,
and DAVID SZCZEPANSKI,

                Defendants.

_____ /

## OPINION AND ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Plaintiffs Sally Hilden and Jerome Flynn were employed as medical technologists in the microbiology laboratory at the Hurley Medical Center in Flint, Michigan. Part of their duties was to receive swabs containing specimens collected from patients at area doctors' offices and try to grow bacteria to identify infectious organisms. Hurley Medical Center furnishes kits the doctors can use to collect the specimens and transport them to the laboratory. The kits include plastic tubes that contain a nutrient liquid in which the bacteria can grow from the time the swab is placed in the tube until it is transported and processed in the laboratory. The kits are marked with an expiration date, after which they should not be used, but sometimes the doctors' offices used expired transport kits to send their specimens to the laboratory. The plaintiffs took issue with the Medical Center's practice of testing the specimens sent in expired transport media: they lodged a complaint with a regulatory authority, and they even destroyed some of the specimens. The resulting discipline for insubordination — Flynn's suspension and Hilden's termination — prompted the present lawsuit. The plaintiffs brought their action for violation of Michigan's Whistleblowers' Protection Act,

violation of public policy, intentional infliction of emotional distress, and unlawful retaliation in violation of the First Amendment.  The defendants filed a motion for summary judgment, and the Court heard oral argument on May 11, 2011.  The Court now finds that the facts cannot establish that the plaintiffs' protected conduct motivated the defendants' actions in disciplining the plaintiffs, and therefore the defendants are entitled to a judgment of dismissal as a matter of law.  The Court will grant the motion for summary judgment and dismiss the case.

I.

Plaintiff Hilden alleges that she was fired unlawfully for blowing the whistle on the defendants' condonation of the use of expired media by doctors to transport specimens to the laboratory for testing, and for filing a complaint with Hurley Medical Center dealing with workplace harassment by her supervisors.  Plaintiff Flynn alleges that he was disciplined unlawfully as a whistleblower.  The defendants contend that Hilden was fired for insubordination and patient endangerment when she destroyed specimens and cultures and cancelled tests in direct disobedience of the laboratory director's instructions for dealing with specimens that arrived at the laboratory in expired transport media, and then filed a false report relating to violence in the workplace when she tried to avoid a conversation with a supervisor who wanted to place Hilden on administrative leave.  Flynn was suspended, the defendants insist, for destroying specimens, although he did not destroy any cultures or cancel tests.

The underlying dispute over laboratory procedures and the circumstances of the job actions require some background information on the operation of the microbiology laboratory at the Hurley Medical Center.

A.  Transport Media and Cultures

The microbiology laboratory tests specimens of tissue and bodily fluid collected from patients to detect the presence of disease-causing pathogens.  Sometimes, the specimens are collected from remote locations — doctors' offices — and transported to the laboratory for testing. Testing consists of introducing the specimen to a nutrient medium in an effort to grow a culture of bacteria and identify the microorganism.

To begin the culturing process, a doctor must collect the specimen from the patient.  The collecting doctor uses a cotton swab kept in a sterile plastic tube with a small amount of nutrient liquid to maintain an environment in which bacteria could grow between the time of collection and culturing.  The plastic tube containing the swab is sent to the Hurley Medical Center laboratory.  The swab and the container together are referred to as "transport media."  When the transport medium arrives at the laboratory, a medical technologist, like the plaintiffs in this case, removes the swab from the container and inoculates a culture plate or a vial consisting of "Lim broth," which provides nutrients to the bacteria.  After bacteria grow on the culture media, a medical technologist who specializes in microbiology identifies the bacteria and provides a report to the doctor.

Hurley Medical Center furnishes transport media to doctors' offices.  Each plastic tube container has an expiration date.  The defendants contend that the expiration date merely signifies the date beyond which the manufacturer cannot guarantee a reliable result.  The defendants insist that the only risk in using expired transport media is that the transport media's nutrient may have lost its ability to sustain bacteria growth during transmittal back to the Hurley laboratory.  Therefore, a negative growth culture may not be reliable, but a positive culture likely would be a true result.

B.  Discovery of Expired Transport Media

On January 19, 2010, second-shift medical technologist Sarah Martinson noticed that the laboratory had received a microbiology specimen from a physician's office in expired transport medium.  Martinson contacted the "outreach troubleshooter group" — an off-site organization that acts as the liaison between the physician offices and Hurley Medical Center — and asked it to notify the physician's office that it had submitted an expired swab, inform the physician's office that a culture had been set up, and request that the physician's office discard any other expired swabs in stock.  Hurley Medical Center has a laboratory information system (LIS) that is separate from Hurley's e-mail system.  Laboratory employees are able to send "mailbox messages" instead of e-mails.  Martinson's message to the troubleshooter group was such a message.

C.  Events Leading to Hilden's Discipline

Sally Hilden arrived at work the evening of January 19, 2010 at 10:30 p.m. and read her mailbox messages.  Hilden spoke with Martinson and reminded her that she was not to inoculate culture media with swabs from expired transport media.  Hilden maintained that such practice was forbidden by the "Joint Commission."  That body, formerly known as the Joint Commission for Accreditation of Hospitals Organization (JCAHO), is an independent, not-for-profit organization that operates accreditation programs for a fee that regulate quality and safety in the delivery of health care.  The Joint Commission has administered a program for the accreditation of hospital laboratories since 1979.  Hilden's interpretation of the Joint Commission's directive — which occurred in 2008 and addressed "reagents" — is disputed.

During the course of her shift, Hilden sent two messages to the troubleshooter group the morning of January 20: one at 5:30 a.m. and another at 5:56 a.m.  The body of the first e-mail stated,

"Swab for GENBHS [genital Beta-haemolytic streptoccus] submitted in expired culture transport

system. Please notify office for recollect."  Mot., Ex. 3, Hilden Jan. 20, 2010, 5:30 a.m. e-mail.  The

second e-mail stated:

> The BBL culture/swab transport system contains transport medium . . . . Per
> manufacturer, these devices are stored 5-25 degrees C and are not used if damaged,
> dehydrated, contaminated, or if past expiration date.  Joint Commission Laboratory
> Standard QC.1.140, EP#4.  Please notify our clients to verify that their inventory is
> current.

Mot., Ex. 3, Hilden Jan. 20, 2010, 5:56 a.m. e-mail.  Hilden then discarded both the swab and the

Lim broth that Martinson had prepared.  She did not tell anyone of her actions.

Later that same day, Varuna "Mitch" Tewari, Hurley's microbiology laboratory director, sent

the following e-mail to all laboratory staff:

> To those doing setups, please keep an eye on swabs coming in and notify someone
> in micro when expired swabs are noted.  We will let the offices know to change them
> out.
>
> However, these cultures should be setup.  Bacti techs, if you are notified that cultures
> have been received on expired swabs, please include a comment on the report to
> indicate this, as the integrity of the specimen may have been compromised.
>
> I am insisting that cultures be set up because in many cases, patients do not return
> for recollection.  Many of the clinics deal with patients that have poor compliance
> with medical instruction.  Therefore, the best course of action is to set the culture up
> while we are waiting for a recollection.  If pathogens are recovered, the patient will
> get treatment earlier than if we had to wait for a recollection.  Obviously, a
> recollection is the only sure way to know that the specimen was not compromised,
> and we should always request another.  But I think that we do owe it to the patient
> to get started on the work as quickly as we can.  Thanks.

Mot. Summ. J., Ex. 5, Tewari Jan. 20, 2010 e-mail.

After reading the Tewari's e-mail, both plaintiffs spoke to their immediate supervisor, Emily

Mahank, about their objections to Tewari's directive to inoculate cultures with swabs from expired

transport media.  Ms. Mahank explained to Hilden that she understood both Tewari's and Hilden's

viewpoints and would leave a note for Tewari outlining their concerns.  Hilden informed Mahank that she was going to speak to clinical laboratory administrative director Sheila Moore in the morning, and Hilden believed that Moore would not support Tewari's instructions.

Early on January 21, 2010, Hilden found two specimens that had been submitted from a physician using expired transport media and that had been processed on the second shift.  Again, she discarded both swabs and the culture plates that had been inoculated by the second-shift medical technologist, and canceled the culture request on the Hurley laboratory computer system.  One of the specimens was from a wound culture from which the physician suspected Methicillin-resistant Staphylococcus aureus (MRSA), a virulent strain of Staph bacteria resistant to antibiotics, and had isolated the patient from his family.  Hilden sent the troubleshooter group an e-mail at 3:15 a.m. that stated, with respect to one of the discarded specimens, "Inappropriate specimen submitted for throat culture BBL culture/swab transport media expired 12/2009," and, with respect to the other discarded specimen, "Inappropriate specimen submitted for abscess culture BBL culture/swab transport media expired 06/2008.  Please notify office."  Mot. Summ. J., Ex. 6, Jan. 21, 2010 Mailbox message from Hilden.

On January 21, 2010 at 6:30 a.m., both plaintiffs met with clinical laboratory administrative director Sheila Moore and discussed their objections to Tewari's directive.  Hilden told Moore that "if [Moore] didn't resolve this, and [Moore's] understanding of resolving it was to make [Tewari] retract his directive, that she would take it further to Joint Commission."  Resp. to Mot. Summ. J., Ex. 4, Moore dep. at 11.  Moore told them that she would talk to Tewari.  However, Hilden did not tell Moore that she had destroyed swabs and culture plates during her last two shifts, and Moore was not otherwise aware of that.  At the time of their meeting with Moore, the plaintiffs had not

attempted to discuss their concerns directly with Tewari or to contact a Joint Commission standards

interpreter.

Moore then spoke with Tewari and told him to call Megan Sawchuk, a Joint Commission

standards interpreter.  Tewari sent an e-mail to Sawchuk and received a reply at 1:06 p.m. the same

day.  Sawchuk's e-mail, which addressed the appropriateness of Tewari's directive, stated in part:

> While the standards do require use of "in-date" materials (QSA.02.14.01), the
> laboratory director may use clinical judgment to determine a reasonable specimen
> rejection policy when receiving expired collection or culture materials. . . . If the
> laboratory has had experience with recovering significant isolates from expired
> materials and it is suspected that recollection will be difficult or impossible, it is
> reasonable to proceed and perform the testing.  The physician should be informed of
> the test limitations and that recollection is suggested.  It is preferable to include this
> information in the laboratory report as a comment or disclaimer.  There should also
> be follow-up to replace expired materials at outreach locations when this occurs.

Mot. Summ. J., Ex. 9, Sawchuk e-mail.  Tewari also spoke with Sawchuk on the telephone about

inoculating cultures with swabs in expired transport media.

At 2:30 p.m. on January 21, Tewari sent another email to all laboratory staff members.  It

stated:

> When resulting cultures setup from expired media, please use the comment code
> "EXPMED".  This code lets the office know the media was expired, the results may
> be suspect, and to discard any remaining expired media.  Thanks.

Mot. Summ. J., Ex. 10, Tewari Jan. 21, 2010 2:39 e-mail.

Later on January 21, Moore discovered that Hilden had destroyed the swabs and cultures for

three specimens.  She requested that Hilden be suspended pending discharge for insubordination and

patient endangerment for destroying the two specimens and culture plates on January 21, in direct

defiance of Tewari's January 20 directive.  Hilden was not disciplined for destroying the specimen

on January 20 because management assumed Hilden did not understand the proper procedure at that

time.  Moore informed the Hurley Labor Relations department that she wanted to place Hilden on notice of investigation and suspend her pending the completion of the investigation.  She was informed that she could not suspend Hilden without a union representative present and that one would not be present when Hilden came into work on January 22, 2010.

David Szczepanski, from the Hurley Labor Relations department, told Moore that she could place Hilden on paid administrative leave until a meeting could be arranged with a union representative on Monday, January 25, 2010 to present her with the suspension pending permission to terminate.  Moore also spoke with Robert Lavole, Moore's vice president, and told him that she thought placing Hilden on administrative leave "ha[d] the potential to be ugly."  Mot. Summ. J., Ex. 7, Moore dep. at 90.  Lavole suggested that Moore call Mark Mitchell, the second or third-shift supervisor for public safety.

Hilden apparently suspected trouble herself, as she called her immediate supervisor, Emily Mahank, in the afternoon of January 22, 2010 and asked if she was going to receive discipline.

### D.  Attempt to Place Hilden on Administrative Leave

When Moore came into work around 10:00 p.m. on January 22, she spoke with Mitchell and told him that she "intended to send someone home on administrative tonight at 10:30 and it has the potential to be ugly."  Mot. Summ. J., Ex. 7, Moore dep. at 91.  Mitchell asked Moore if she thought they should involve the house director.  She replied in the negative, and Mitchell told Moore to call him if things got out of hand.  Tewari agreed to be present with Moore when she placed Hilden on administrative leave, in the event that Hilden declined union representation and wanted to talk about the situation.

Shortly after Hilden arrived for work that evening, Moore asked to speak with her. Hilden peeked her head into Moore's office and asked if she had a union representative, and Moore replied that she did not. Hilden refused to speak with Moore and walked down the hall into the locker room. Moore approached the locker room and opened the door to discover that several people were in the locker room. Hilden called out: "Sally, I really need to talk to you," to which Hilden replied, "Not without union representation." Mot. Summ. J., Ex. 7, Moore dep. at 93.

Moore went back to her office and called Nancy Brooks, the house director — the registered nurse in charge of the nursing activities on the third shift who also periodically provides assistance to other department supervision — who agreed to talk to Hilden. At some point, Hilden left the locker room and moved to the "PCR," a subsection of the microbiology laboratory that tests for sexually transmitted diseases. Brooks met with Moore in her office and asked Moore to point out Hilden so Brooks could ask her to step out in the hallway and talk. Brooks, followed by Moore and Tewari, entered the PCR. Brooks introduced herself to Hilden and asked "if she would just step out in the hall so we could talk." *Id.* at 96. Sally responded that "she was being threatened and harassed by management due to an ongoing Joint Commission investigation and if Nancy continued in that manner she'd be added to the list." *Ibid.* Brooks replied, "I'm not threatening you, I just asked you to step out in the hall to talk." *Ibid.* At that point, Hilden walked past Brooks and Moore to the telephone and called the public safety department and told public safety that "she needed an officer because she was being threatened and harassed by management." *Id.* at 97. Brooks, Moore, and Tewari stepped out into the hallway.

Mitchell arrived along with two other safety officers, and Moore and Brooks updated him on the situation. Mitchell told Moore, Brooks, and Tewari that he was going to "go in there and tell

her that she's being sent home on administrative leave and it would be better if she came with me, because otherwise I'm going to have to escort her out." *Id.* at 99. Mitchell entered the PCR alone and came out with Hilden. *Id.* at 99-100. Brooks spoke with Hilden, asking her if she was okay, and Moore told Hilden she was being placed on administrative leave until they could get union representation, which she assumed would be Monday. Hilden was escorted from the building. Moore alleges that she did not raise her voice or yell at Hilden during this interaction. Hilden remembers otherwise.

### E. Hilden's Unsafe Work Complaint

Hilden filed an unsafe workplace complaint against Moore and Tewari on January 27, 2010. Her complaint stated that she "was completely astonished that [Moore and Tewari] would come in on a Friday night to issue a discipline that Emily [Mahank] would have normally been left with to deliver. It was apparent to [her] that this was deliberate and intimidating." Mot. Summ. J., Ex. 12, Hilden unsafe work complaint. The text of the complaint need not be set forth here. It is sufficient to note that factually it parallels Moore's account of the events, albeit with more dramatic language and written from Hilden's point of view. However, in the complaint, Hilden accused Moore and Tewari of trying to harass and intimidate her and accused Moore of "stalking" her.

Hurley conducted an investigation, and the investigator, Jamal Ghani, found Hilden's complaint to be meritless. On February 5, 2010, Hurley's vice president of procedural and ambulatory services sent a memorandum on behalf of Ghani to the Safe Workplace Oversight Team that stated:

> I have completed my investigation of the safe workplace incident #1007. I found the complaint to be unsubstantiated and actions of lab management and the house director to be professional and appropriate.

-10-

Witness statements support the investigative findings. No corrective action necessary.

Mot. Summ. J., Ex. 13, Complaint Investigation.

### F. Hilden's Termination

Hilden's employment was terminated on March 10, 2010 for insubordination. The Notice

of Layoff explained:

> On February 12, 2010, you were suspended pending permission to terminate for violation of Employee Conduct Rule #10 and #34. Your behavior on 1/21/10 amounted to clear insubordination when you discarded culture material and cancelled tests that were set up by other Medical Technologist. This behavior was complete [sic] disregard to a clear directive from your supervisor. You put our patients at risk with this gross misconduct.

Mot. Summ. J., Ex. 18, First Notice of Layoff.

On May 4, 2010, Hurley issued an additional notice of layoff for Hilden's false report of

violence in the workplace. It stated:

> On January 22,2010 you filed a false report related to violence in the workplace. You are hereby terminated for gross misconduct related to violation of Employee Conduct Rule #16 and Employee Conduct Rule #32 as outlined in your suspension. Permission was previously granted for your termination on March 10, 2010. Accordingly, you are also terminated effective May 4, 2010 for these additional violations of Employee Conduct Rules.

Mot. Summ. J., Ex. 18, Second Notice of Layoff.

### G. Jerome Flynn's discipline

On January 22, 2010, at 6:11 a.m., Flynn discarded transport media that had been processed

by a co-worker on the previous shift and canceled a culture request on the computer, but he did not

discard the culture plate; the inoculated specimen results could be recovered. In the afternoon on

January 22, Tewari called Flynn to ask where the discarded swab had been discarded. Flynn did not

return his call that day.

-11-

On February 17, 2010, Moore suspended Flynn for 15 calendar days.  The disciplinary action stated:

> An investigation has substantiated the allegation that you refused to obey the orders of a supervisor.  By your own admission, you discarded a culture swab and canceled a culture that had previously been processed by a coworker, potentially placing the patient's safety at risk.  You have demonstrated a willful disrespect of managerial authority.  Due to the serious nature of this work rule violation, you are hereby suspended for 15 calendar days.  Future violations of HMC work rules will be met with progressive discipline, up to and including termination.

Mot., Ex. 17, Flynn Record of Disciplinary Action.

### H.  Hilden's complaint to the Joint Commission

On February 4, 2010, Hurley's medical director, Dr. Michael Boucree, was notified that the Joint Commission had received an anonymous complaint regarding the Hurley laboratory.  Moore provided information for Dr. Boucree's response, and the Joint Commission Office of Quality Monitoring sent a letter to Hurley's chief executive officer dated February 26, 2010 that stated no action was needed.  The letter stated:

> I am writing to inform you that based on review of your organization's response to incident number 122494, The Joint Commission will take no further action at this time.  However, should we receive additional information that may be relevant to these issues in the future, a determination will be made at that point if further evaluation will be required.

Mot. Summ. J., Ex. 16, Joint Commission e-mail to HMC.

Hilden alleges that she complained to the Joint Commission about Hurley's use of expired transport media via e-mail early in the afternoon on January 22, 2010, well before she had any contact with Moore and Tewari.  Hilden also complained to the Corporate Compliance Hotline on January 22, 2010 and January 24, 2010.  There is no evidence in the record that either Moore or Tewari were aware of the complaints when they placed Hilden on administrative leave.

-12-

### I.  Post-termination incident

At some point after Hilden had been fired, Carma Huff, a friend of Moore's and a former Hurley employee, had a conversation over lunch with Moore in which Moore bragged about firing Hilden and stated that "she knew Sally [Hilden] would get her job back but that it would be a very long time."  Resp. to Mot. Summ. J., Ex. 6, Huff Aff. ¶ 11.

### J.  The present action

The plaintiffs filed suit against the defendants in the Genesee County, Michigan circuit court on March 19, 2010.  After amending their complaint several times, the plaintiffs filed a third amended complaint on June 18, 2010, which included a federal claim.  The defendants then removed the case to this Court.  The third amended complaint included claims on behalf of both Hilden and Flynn for violations of Michigan's Whistleblowers' Protection Act (WPA) (Count I and II); violation of public policy, if the Whistleblowers' Protection Act is found not to apply (Count III); intentional infliction of emotional distress of Hilden (Count IV); and violations of the plaintiffs' First Amendment rights via 42 U.S.C. § 1983 (Count V).

The defendants filed a motion for summary judgment attacking all of the counts of the third amended complaint.  The main thrust of their argument is that the undisputed evidence shows that the plaintiffs were not disciplined for speaking out about the use of expired transport media; rather, Flynn was suspended for discarding specimens, and Hilden was fired for that and taking the temerarious and insolent action of destroying the culture media and cancelling tests set up by other laboratory technicians.  The defendants also argue that the WPA claims must fail because the Joint Commission requirements are not laws, rules, or regulations and therefore the plaintiff's complaints to the Joint Commission were not protected activity; Hilden's complaint to the public safety

department is not protected because it was made in bad faith; the discipline does not violate public policy because the plaintiffs' complaints deal only with a breach of internal rules, and the claim is preempted by the WPA; the claim for intentional infliction of emotional distress fails because the defendants' conduct was not "outrageous"; and the First Amendment claim cannot proceed because the plaintiffs were complaining about matters within their official duties and not as citizens speaking out on a matter of public concern.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required only when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A motion for summary judgment under Rule 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

The party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence

of a genuine dispute over material facts.  Fed. R. Civ. P. 56(c)(1)(A), (B); *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).  If the party opposing the motion contends that facts are in dispute, he may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson*, 477 U.S. at 252.  If the non-moving party, after sufficient opportunity for discovery, is unable to meet his burden of proof, summary judgment is clearly proper.  Fed. R. Civ. P. 56(e)(3); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

At the summary judgment stage, "the evidence should be viewed in the light most favorable to the non-moving party[, and] the facts and any inferences that can be drawn from those facts[] must be viewed in the light most favorable to the non-moving party.'"  *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citations omitted)); *see also Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) ("In evaluating the evidence, [the district court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'") (quoting *PDV Midwest Ref., L.L.C. v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002)).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact.  *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000).  A fact is "material" if its resolution affects the outcome of the lawsuit.  *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).  "Materiality" is determined by the substantive law claim.  *Boyd v.*

-15-

*Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).

## A. First Amendment claim

To prevail on a First Amendment retaliation claim, a plaintiff must show that (1) she was "engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two — that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc); *see also Evans-Marshall v. Board of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 337 (6th Cir. 2010). Notwithstanding a showing of all three, the defendants may escape liability by showing that they would have taken the same action in the absence of the protected activity. *Thaddeus-X*, 175 F.3d at 399; *see also Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586 (6th Cir. 2008).

## 1. Protected conduct

"It is well settled that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Garcetti v. Ceballos*, 547 U.S. 410, 413 (2006) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)). However, the Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

-16-

The defendants contend that the plaintiffs' complaints to them about the use of expired transport media and the Hurley laboratory's response fell within their job duties.  There is no evidence of the plaintiffs' formal job descriptions that include a reporting obligation.  But, as the defendants point out, the pursuant-to-official-duties rule applies equally to "*ad hoc* or *de facto* duties not appearing in any written job description" as long as the speech "'owes its existence to [the speaker's] professional responsibilities.'" *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010) (quoting *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544 (6th Cir. 2007)).

To determine whether public employee speech is protected by the First Amendment, a court must ask two questions: (1) did "the employee [speak] as a citizen on a matter of public concern" and (2) if so, did "the relevant government entity ha[ve] an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418.  The second question "reflects the importance of the relationship between the speaker's expressions and employment.  A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Ibid.*  The *Garcetti* Court "acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion," but refused public employees the power to "'constitutionalize [their] grievance[s].'" *Id.* at 419-20 (quoting *Connick*, 461 U.S. at 154).

The plaintiffs contend that they were speaking out on a matter of public concern, not as employees of the laboratory.  They rely heavily on the Sixth Circuit's opinion in *Rodgers v. Banks*, 344 F.3d 587 (6th Cir. 2003), in which the court stated that the "quality of patient care in state

-17-

hospitals presents an issue of public concern." *Id.* at 600-01.   In that case, Carolyn Rodgers was fired after she wrote a memorandum to the CEO of the Pauline Warfield Lewis Center, an Ohio state mental hospital.  Rodgers was employed as the Director of Quality Management, and her principal job duty was to "prepare the Center for surveys by the Joint Commission on Accreditation of Hospitals . . . and other surveying organizations." *Ibid.*  Rodgers drafted the memorandum in response to the hospital CEO's decision to grant a psychiatrist's request to move his office to one of the patient units; the memorandum highlighted how the move could negatively affect patient privacy and potentially cause the hospital to lose its certification.  The Sixth Circuit held that Rodgers's memorandum dealt with an issue of public concern and was protected by the First Amendment.

Several recent Sixth Circuit cases suggest that the *Rodgers* rationale would not survive *Garcetti*.  In *Fox*, for instance, the court held that a teacher's "complaints to her supervisors about the size of her teaching caseload were not protected . . . [because] the speech in question . . . was made not in her role as a 'public citizen' but as an employee, that it was made to her immediate supervisors, and that it did not address a matter of 'public concern' but, rather, only the conditions of her employment."  *Fox*, 605 F.3d at 346-47.

In *Weisbarth v. Geauga Park District*, 499 F.3d 538 (6th Cir. 2007), the plaintiff cited as protected speech a conversation she had with an outside consultant whom the ranger department had engaged to assess morale and performance within the department.  The court held that the conversation was made pursuant to the plaintiff's official duties, even though giving the interview was "an ad hoc or de facto dut[y that did not] fall within the scope of an employee's official responsibilities . . . appearing in [her] written job description."  *Weisbarth*, 499 F.3d at 543-44.

-18-

In *Haynes v. City of Circleville*, 474 F.3d 357 (6th Cir. 2007), the plaintiff was a police officer who wrote a memorandum to a supervisor expressing discontent about the financial cutbacks and changes to the canine-training program that he directed. The court had no trouble concluding that the memo was not protected speech, but amounted to nothing more than "'the quintessential employee beef: management has acted incompetently.'" *Id.* at 365 (quoting *Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir. 1988)).

In *Rodgers v. Banks*, Carolyn Rodgers made her statements pursuant to her duties as Director of Quality Management. It is difficult to distinguish that case from the Sixth Circuit's post-*Garcetti* cases that have found such conduct not protected by the First Amendment. That court's more recent treatment of the issue calls into question the plaintiffs' arguments that their complaints about processing specimens sent to the laboratory in expired transport media were protected speech. And to the extent that the plaintiffs complained to their supervisors or other hospital personnel, the Court must conclude that *Garcetti* would preclude a First Amendment retaliation claim based on those communications.

The plaintiffs took their complaints one step further, however, by lodging them with an outside regulatory agency. The fact remains that the "quality of patient care in state hospitals presents an issue of public concern." *Rodgers*, 344 F.3d at 600-01. And bringing to light a concern about an internal hospital practice that impacts the potential accuracy of diagnostic tests — when those complaints are shared outside the confines of the employment setting — can amount to protected speech. *See Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 768 & n.13 (6th Cir. 2010) (holding that a court administrator's complaints that a judge was proselytizing from the bench "fell outside [her] assigned tasks as an administrator, given that this was an extraordinary rather than

-19-

everyday communication," and that "the nature of [her] complaints implicates the propriety and legality of public, in-court judicial conduct, and renders her speech of sufficient public gravity to warrant First Amendment protection"); *see also Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986) ("Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law.").

The plaintiffs allege that they complained to the Hurley Medical Center corporate compliance hotline. That is an internal body. Presumably, all employees are expected to notify the compliance department when they have an appropriate concern. That complaint is not protected by the First Amendment. However, the plaintiffs also complained to the Joint Commission, an outside regulatory body. That conduct transcended their job duties and most likely constituted protected speech.

Hilden also contends that her contact with the public safety department complaining of workplace harassment was protected by the First Amendment. It is not. The complaint was made to an internal body, and the plaintiffs have not established that the speech touched on a matter of public concern. *See Farhat v. Jopke,* 370 F.3d 580, 593 (6th Cir. 2004) (holding that employee speech was not a matter of public concern since the focus of employee's letters was a personal gripe with employer); *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 412 (6th Cir. 1994) (stating that press release issued by nurse did not touch upon public concern because the focus was not on patient endangerment so much as it was employee dissatisfaction with work rules).

Finally, and perhaps most importantly, it is beyond peradventure that the plaintiffs' actions of discarding specimens, destroying the inoculated cultures, and cancelling tests are not protected by the First Amendment. That conduct cannot be considered symbolic action, because it was not

-20-

"'sufficiently imbued with elements of communication to fall within the scope of the First . . . Amendment[].'" *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974) (holding that prosecution of defendant for burning an American flag during a protest rally violated the defendant's right to free expression under the First Amendment). It is abundantly clear that the destruction of the test samples was not intended as a communication; the acts were done in secret and not reported. Rather, the conduct was intended to ensure that the tests would not be completed and that no results would be obtained. The destruction of the cultures and specimens was not protected speech.

### 2. Adverse action

There is no dispute that Hilden's termination and Flynn's fifteen-day suspension without pay constituted adverse employment action.

### 3. Causation

The plaintiffs argue that they have two "smoking guns," that is, admissions from the defendants that they fired Hilden for inappropriate reasons. The first relates to the First Amendment claim, and consists of Hilden's first notice of layoff because the defendants admit that they fired Hilden for discarding outdated specimens in expired collection devices and canceling tests, all to protect Hurley Medical Center, patients, and their doctors.

That evidence does not establish causation. Instead, it proves that the defendants fired Hilden for a proper reason: destroying the specimens and test samples. The conduct amounts to obvious insubordination. It is noteworthy that Hilden was not disciplined for destroying the inoculated cultures before she received Terawi's memorandum instructing that tests should be set

up and run on specimens received in expired transport media.  The discipline was based on Hilden's post-memo conduct.

What about the plaintiffs' protected speech?  The plaintiffs must prove "'that the speech at issue represented a *substantial* or *motivating* factor in the adverse employment action.  Specifically, [they] must point to specific, nonconclusory allegations reasonably linking [their] speech to employer discipline.'"  *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (quoting *Rodgers*, 344 F.3d at 602).  The Sixth Circuit has interpreted "motivating factor" to mean the but-for cause, "without which the action being challenged simply would not have been taken."  *Ibid.* (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)).

Although the Sixth Circuit is reluctant to find causation in temporal proximity alone, *see, e.g., Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) ("The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."); *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) ("Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection."); *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an interference [sic] of retaliation."), that court "recogniz[es] the possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but also recogniz[es] that often evidence in addition to temporal proximity is required to permit the inference."  *Vereecke*, 609 F.3d at 401.

-22-

The plaintiffs have failed to show that their speech — the complaint to the Joint Commission — was the but-for cause of their respective adverse employment actions. The plaintiffs have offered only temporal proximity as evidence of causation. *Tuttle*, 474 F.3d at 321 ("The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."). There is no evidence that any personnel at Hurley Medical Center was aware prior to the decision to impose discipline that either of the plaintiffs complained to the Joint Commission or any other outside agency. The only evidence in the record is that the hospital's medical director was notified on February 4, 2010 that an anonymous complaint had been filed. Moreover, Mahank and Moore, the only people the plaintiffs spoke with about their concerns before Moore decided to discipline them both, were receptive to the plaintiffs' reports and immediately took action to discover whether Tewari's directive contravened any rules or regulations. That fact alone strongly suggests that Hilden and Flynn would not have suffered adverse employment actions if they had simply reported what they believed was a violation of law and not destroyed swabs and culture media. There is no direct evidence of causation, and there is no evidence from which a reasonable jury could infer that the defendants disciplined the plaintiffs on account of speech protected by the First Amendment.

* * * * * * * * *

The plaintiffs have not offered evidence sufficient to create a fact question on all the elements of their First Amendment retaliation claim. Therefore, the defendants are entitled to summary judgment on that claim as a matter of law.

B. Whistleblowers' Protection Act claim

The WPA prohibits an employer from:

> discharg[ing], threaten[ing], or otherwise discriminat[ing] against an employee
> regarding the employee's compensation, terms, conditions, location, or privileges of
> employment because the employee . . . reports or is about to report, verbally or in
> writing, a violation or a suspected violation of a law or regulation or rule
> promulgated pursuant to law of this state, a political subdivision of this state, or the
> United States to a public body, unless the employee knows that the report is false.

Mich. Comp. Laws § 15.362.  "To establish a prima facie case under [the WPA], a plaintiff must

show that (1) the plaintiff was engaged in a protected activity as defined by the act, (2) the plaintiff

was discharged or discriminated against, and (3) a causal connection exists between the protected

activity and the discharge or adverse employment action."  *West v. General Motors Corp.*, 469

Mich. 177, 183-84,  665 N.W.2d 468, 471-72 (citing *Chandler v. Dowell Schlumberger, Inc.*, 456

Mich. 395, 399, 572 N.W.2d 210 (1998)).  Once the plaintiff has proved a *prima facie* case, the

defendant then must articulate a legitimate business reason for the plaintiff's discharge.  *Shaw v.*

*Ecorse*, 283 Mich. App. 1, 8, 770 N.W.2d 31, 37 (2009).  If the defendant is able to articulate such

a reason, the plaintiff bears the burden of showing that the defendant's reason was merely pretextual.

*Shaw*, 283 Mich. App. at 8, 770 N.W.2d at 37; *Eckstein v. Kuhn*, 160 Mich. App. 240, 246-47, 408

N.W.2d 131, 134 (1987).

     The defendant contends that a complaint to the Joint Commission is not protected activity

because the Joint Commission is not a state agency.  Protected activities consist of "(1) reporting

to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation

to a public body; or (3) being asked by a public body to participate in an investigation."  *Chandler*,

456 Mich. at 399, 572 N.W.2d at 212 (citing Mich. Comp. Laws § 15.362); *Shallal v. Catholic Soc.*

*Servs. of Wayne Cnty.*, 455 Mich. 604, 610, 566 N.W.2d 571, 575 (1997).

     The WPA defines "public body" to include "[a]ny other body which is created by state or

local authority or which is primarily funded by or through state or local authority, or any member

or employee of that body." Mich. Comp. Laws § 15.361(d)(iv).  Under that definition, the hospital

itself and the plaintiffs' supervisors qualify.  The WPA "does not require that an employee of a

public body report violations or suspected violations to an outside agency or higher authority to

receive the protections of the WPA." *Brown v. Mayor of Detroit*, 478 Mich. 589, 591, 734 N.W.2d

514, 515 (2007); *see also Debano-Griffin v. Lake Cnty.*, 486 Mich. 938, 938, 782 N.W.2d 502

(2010) ("Reporting a 'suspected violation of a law' is a protected activity.").

Moreover, the Joint Commission likely qualifies as well.  The Centers for Medicare and

Medicaid Services (CMS) is a federal agency within the United States Department of Health and

Human Services that administers the Medicare program.  CMS regulates all laboratory testing

(except research) performed on humans in the United States through authority conferred by the

Clinical Laboratory Improvement Amendments (CLIA), 42 U.S.C. § 263a, and its implementing

regulations.  All clinical laboratories must be certified to receive Medicare or Medicaid payments.

*Wade Pediatrics v. Dep't of Health and Human Servs.*, 567 F.3d 1202, 1203 (10th Cir. 2009).  CMS

has determined that accreditation by private "accreditation organizations" may satisfy a clinical

laboratory's obligation to meet applicable CLIA program requirements if certain conditions are met.

42 C.F.R. § 493.551(a).  One such condition is that "[t]he requirements of the accreditation

organization . . . are equal to, or more stringent than, the CLIA condition-level requirements . . . ."

42 C.F.R. § 493.551(a)(1).  The Joint Commission is one such private accreditation organization.

It has administered a program for the accreditation of hospital laboratories since 1979.

In their Third Amended Complaint, the plaintiffs allege that they reported violations of the

Joint Commission standard QC.1.140; 42 C.F.R. § 493.1252(d); 21 C.F.R. § 610.53; and 21 C.F.R.

§ 809.10 to the following individuals and entities: (a) Hurley Medical Center Corporate Compliance

on January 22 and 23, 2010; (b) Joint Commission on January 22, 2010; (c) Sheila Moore, administrative laboratory director on January 21, 2010; (d) Emily Mahank, laboratory service coordinator on January 19, 2010 and January 20, 2010; (e) Dr. Michael Boucree, chief quality officer on January 25, 2010; (f) Jamal Ghani, senior vice-president of operations on February 25, 2010; (g) David Szczepanski, director of labor relations, "on or about 1/23/10-1/30/10"; (h) Elizabeth Henkel, human resources department, "on or about 1/23/10-1/30/10"; (i) Aaron Moses, laboratory coordinator, on January 23, 2010; and (j) HMC's Board of Managers on February 20, 2010.

Plaintiff Hilden also argues that her complaint to the hospital public safety department that she was being harassed by management constitutes protected conduct. She says that the second notice of layoff is the second "smoking gun" establishing illegal motivation by the defendants in firing her. The notice states, "On January 22, 2010 you filed a false report related to violence in the workplace. You are hereby terminated for gross misconduct related to violation of Employee Conduct Rule #16 and Employee Conduct Rule #32 as outlined in your suspension." Resp. to Mot. Summ. J., Ex. 9, May 4, 2010 Notice of Layoff. The plaintiffs insist that the law allows Hilden to file a complaint against a co-employee and firing her for it constitutes a violation of the WPA. The plaintiffs also argue that whether Hilden filed the allegedly false report in bad faith is a jury question, not one the Court can answer.

### 1. Complaints regarding expired transport media

With respect to the complaints about the use of expired transport media, the defendants correctly argue that the plaintiffs have furnished no evidence of a causal connection between their protected activity and their adverse employment actions. The plaintiffs argue that Hilden's notices

-26-

of layoff, which states, "Your behavior on 1/21/10 amounted to clear insubordination when you discarded culture material and cancelled tests that were set up by other Medical Technologist," Mot. Summ. J., Ex. 18, First Notice of Layoff, is proof that she was fired for engaging in protected activity, namely discarding outdated specimens and canceling tests. As noted above, the plaintiffs' contention that discarding specimens and canceling tests constituted protected activity is devoid of merit. The WPA protects employees that report, or are about to report, a violation of a law or regulation to public body, unless the employee knows that the report is false. Discarding specimens cannot be equated with making a report. Not only can discarding specimens not be considered protected activity, Hilden, when given the chance to "report" her activities, did not tell Moore that she had destroyed swabs and culture plates during their early-morning meeting on January 21, 2010.

Moreover, two pieces of evidence weigh strongly against the plaintiffs' attempt to establish causation. First, when both plaintiffs met with Moore on January 21, 2010 to discuss their concerns, Moore immediately spoke with Tewari and instructed him to contact a Joint Commission standards interpreter. Mahank and Moore, the only people the plaintiffs spoke with about their concerns prior to receiving disciplinary actions, were receptive to the plaintiffs' reports and immediately took action to discover whether Tewari's directive contravened any rules or regulations. Hilden and Flynn likely would not have suffered adverse employment actions if they simply had reported what they believed was a violation of law. Moore did not make the decision to terminate Hilden's employment until she discovered that Hilden had discarded two swabs and culture media after Tewari's January 20 directive.

Second, Hilden called Mahank in the afternoon of January 22, 2010, and asked if she was going to receive discipline. Her phone call indicates that she knew she had done something wrong.

-27-

Her good working relationship with Tewari makes that even more clear.  Hilden testified that she had an acceptable working relationship with Tewari, she felt comfortable giving him ideas and suggestions, and he had never responded negatively to her.  Mot. Summ. J., Ex. 4, Hilden dep. at 29.

The plaintiffs do point to a lunchtime conversation between Moore and Huff during which Moore bragged about firing Hilden.  That conversation certainly suggests that a personality conflict existed between Moore and Hilden, but it does nothing to establish that Moore fired Hilden because of her decision to report a suspected violation of any law, rule, or regulation.  The plaintiffs argue that they can establish a causal connection with evidence of displeasure, hostility, or anger towards the plaintiffs.  The Michigan Court of Appeals has found that a close temporal relationship, combined with "clear displeasure with the protected activity," was enough to establish causation, *West v. General Motors Corp.*, 469 Mich. 177, 186-87, 665 N.W.2d 468, 473 (2003), but the plaintiffs do not have such evidence in this case.  The "anger" (perhaps an exaggerated characterization of Moore's disposition that evening) the plaintiffs point to stems from Hilden's refusal to speak with Moore, not the plaintiffs' comments regarding Tewari's directive.  Hilden thought she might be in trouble, and she became irrational when she came into work on January 22, 2010 and found Moore waiting to speak with her.  Hilden refused to speak with Moore without a union representative despite the fact that one was not needed to place her on administrative leave. Hilden fled to the locker room and locked herself in the bathroom.  Moore entreated Hilden to come out and speak with her, and when that plan failed, she asked the house director to come to the lab to speak with Hilden.

Viewing all those facts in the light most favorable to the plaintiffs, as the Court must at this stage of the proceedings, it is not possible to detect an inference that the discipline was motivated

at all by complaints the plaintiffs made about the practice of running cultures on specimens sent to the laboratory in expired transport media.

### 2. Unsafe workplace complaint

The events that resulted in Hilden's violence in the workplace complaint all emerged from management's efforts to place Hilden on administrative leave. Hilden alleged in that complaint that Moore was stalking her in violation of Michigan Compiled Laws § 750.411(h) and (i). The reported facts, from both Moore and Hilden, do not suggest that Moore was "stalking" Hilden, and the suggestion that she was doing so is bizarre. But the WPA protects an employee's right to make a complaint, unless "the employee knows that the report is false." Mich. Comp. Laws § 15.362.

Hilden avers that "[she] subjectively, in [her] heart and mind . . . believed that [she] was being stalked and/or assaulted on [January 22, 2010]." Resp. to Mot. Summ. J., Ex. 14, Hilden Aff. ¶ 8. The Unsafe Workplace Complaint does not seem to contain any patently false allegations; it paints a relatively accurate version of the events of January 22, 2010. However, Hilden runs into trouble when one considers the fact that the Unsafe Workplace Complaint does not appear to describe any sort of threatening or harassing behavior. Her allegation seems slightly absurd when one considers that Hilden, when confronted in the PCR, chose to walk by Brooks and Moore and in front of Tewari to use the telephone to call Public Safety when she could have left the lab through the back door to use a different phone. Her telephone call and complaint appear to be more of a calculated, last-ditch effort to save her job and less the response of a frightened employee. But the Court cannot reach that conclusion, as obvious as it may be, without engaging in fact finding.

Instead, the obstacle to Hilden's success in resisting summary judgment on this count is establishing causation. Certainly, the second layoff notice cites Hilden's complaint as a ground for

firing her. But the undisputed fact remains that she was already fired. In *Shallal v. Catholic Social Services of Wayne County*, the Michigan Supreme Court held that the plaintiff had failed to establish the necessary causal connection because "she knew that she was going to be fired before she confronted her supervisor; thus, she used the information she had about the defendant's illegal activities as a guise to force the defendant to allow her to keep her job." 455 Mich. at 615, 566 N.W.2d at 576-77. Similarly, in *Wolcott v. Champion International Corp.*, 691 F. Supp. 1052 (W.D. Mich. 1987), the court granted summary judgment to the defendant where the plaintiff failed to make out *prima facie* case because the report was filed only after the plaintiff knew he was being fired. In this case, Hilden was apprised of her impending discipline; it was unusual for Moore and Tewari to be at work at 10:30 p.m, and Hilden's fears were confirmed when Moore asked to speak with her before she started her shift. Hilden was initially discharged for discarding swabs and culture media. The second Notice of Layoff was the completion of a workplace grievance process that ran its course after Hilden's initial termination.

The Court finds, therefore, that the Hilden's complaint about workplace harassment and the second layoff notice do not support her claimed WPA violation. The defendants are entitled to summary judgment on that count.

### C.  Public policy violation claim

Under Michigan law, contracts for an indefinite term of employment are presumed to be at will. *Lytle v. Malady*, 458 Mich. 153, 163-64, 579 N.W.2d 906, 910 (1998). Thus, an employee "may be terminated for any or for no reason." *Clifford v. Cactus Drilling Corp.*, 419 Mich. 356,

363, 353 N.W.2d 469, 472 (1984) (Williams, C.J., dissenting).  To temper the often harsh rule of "at-will" employment, Michigan courts "have identified specific grounds for termination as being repugnant to a clearly expressed public policy" such that "the employer's absolute freedom to terminate employment is circumscribed."  *Ibid*; *see also Edelberg v. Leco Corp.*, 236 Mich. App. 177, 180, 599 N.W.2d 785, 786 (1999); *Wiskotoni v. Michigan National Bank-West*, 716 F.2d 378, 382 (6th Cir. 1983).  The Sixth Circuit explained in *Wiskotoni* that a public policy termination claim under Michigan law generally rested on one of three grounds:

> (1) explicit legislative statements prohibiting the discharge of employees who exercise a statutory right or perform a statutory duty, *e.g.,* The Whistleblowers' Protection Act, Mich. Comp. Laws § 15.362; (2) legislative statements of public policy that imply a cause of action for wrongful termination, *e.g.,* refusal to violate a law in the course of employment; and (3) an implied public policy prohibition of a discharge in retaliation for an employee's exercise of a legislatively conferred right, *e.g.,* filing of workers' compensation claims.

*Wiskotoni*, 716 F.2d at 382 (citing *Suchodolski v. Michigan Consolidated Gas Co.*, 412 Mich. 692, 694-95, 316 N.W.2d 710, 711 (1982)); *see also Kimmelman v. Heather Downs Mgmt. Ltd*, 278 Mich. App. 569, 573, 753 N.W.2d 265, 268 (2008); *Edelberg*, 236 Mich. App. at 180, 599 N.W.2d at 786.

Public policy claims are not sustainable where there is an "applicable statutory prohibition against discharge in retaliation for the conduct at issue."  *Dudewicz v. Norris-Schmid, Inc.*, 443 Mich. 68, 80, 503 N.W.2d 645, 650 (1993), *overruled on other grounds by Brown v. Mayor of Detroit*, 478 Mich. 589, 734 N.W.2d 514 (2007).  In fact, "[t]he WPA provides the exclusive remedy for . . . a retaliatory discharge" when the employee suffers retaliation for reporting or planning to report a suspected violation of a law, regulation, or rule to a public body.  *Kendall v. Integrated Interiors, Inc.*, No. 283494, 2009 WL 3321515, at *2 n.2  (Mich. Ct. App. Oct. 15, 2009) (citing

*Dudewicz*, 443 Mich. at 78-79, 503 N.W.2d at 649-50); *see also Allen v. Charter County of Wayne*, 192 F. App'x 347, 353 (6th Cir. 2006).

Where the WPA is not applicable because, for instance, the employee does not complain to a public body and instead refuses a private employer's direction to violate the law, *see Morrison v. B. Braun Medical, Inc.,* No. 07-13567, 2008 WL 4287821 (E.D. Mich. Sept. 15, 2008), *opinion vacated on reconsideration*, 2009 WL 1163988 (E.D. Mich. Apr. 29, 2009), a public policy violation claim may proceed. Such is not the case here. In this case, the plaintiffs reported the suspected violation of a law, rule, or regulation to a public body, thereby triggering the WPA. A public policy claim is not sustainable when the WPA is applicable. *Kendall*, 2009 WL 3321515, at *2 n.2 (holding that "[t]he WPA . . . preempts common-law public policy claims arising from the same activity." (citing *Dudewicz*, 443 Mich. at 78-79, 503 N.W.2d at 649-50)).

### D.  Intentional infliction of emotional distress claim

The Michigan Supreme Court has expressed doubt that the state recognizes the tort of intentional infliction of emotional distress. *See Smith v. Calvary Christian Church*, 462 Mich. 679, 686 n.7, 614 N.W.2d 590, 593 n.7 (2000) (noting that the court "ha[s] not been asked to, and do[es] not, consider whether the tort of intentional infliction of emotional distress exists in Michigan"). To the extent the tort is recognized in Michigan, "a plaintiff must prove the following elements: '(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress.'"  *Hayley v. Allstate Ins. Co.*, 262 Mich. App. 571, 577, 686 N.W.2d 273, 276 (2004) (quoting *Graham v. Ford*, 237 Mich. App. 670, 674, 604 N.W.2d 713, 716 (1999)).

"Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Graham*, 237 Mich. App. at 674, 604 N.W.2d at 716; *see also Brown v. Cassens Transport Co.*, 546 F.3d 347, 364 (6th Cir. 2008) (finding that fraudulent denial of worker's compensation benefits did not rise to level of outrageousness required to recover for intentional infliction of emotional distress); *Garretson v. City of Madison Heights*, 407 F.3d 789, 799 (6th Cir. 2005). Although Michigan law does not allow for the recovery of emotional distress resulting from the breach of an employment contract, *Valentine v. General American Credit, Inc.*, 420 Mich. 256, 263, 362 N.W.2d 628, 631 (1984), a plaintiff may recover for intentional infliction of emotional distress resulting from a retaliatory discharge, *Phillips v. Butterball Farms Co., Inc.*, 448 Mich. 239, 241-42, 531 N.W.2d 144, 144-45 (1995).

Nonetheless, the emotional distress experienced by the plaintiff must be severe. *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 608-09, 374 N.W.2d 905, 911 (1985) ("The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." (quoting Restatement (Second) of Torts § 46, cmt. j)). Although a physical manifestation of an emotional injury is not a *sine qua non* of recovery for intentional infliction of emotional distress, the plaintiff carries a heavier burden to show emotional injury in the absence of physical injury. *Id.* at 609, 374 N.W.2d at 911 (requiring "more in the way of outrage" in the absence of physical injury) (citation omitted). Perhaps in recognition of the axiom that "[c]omplete emotional tranquility is seldom attainable in this world," a plaintiff is not entitled to recover damages for intentional infliction of emotional distress where she supplies "no evidence of grief, depression, disruption of life style, or of treatment for anxiety or depression." *Ibid.* (quoting Restatement (Second) of Torts § 46, cmt. j).

The plaintiffs argue that it is outrageous to fire an employee for following the law and to chase an employee through the halls of Hurley Medical Center, shouting and yelling. The Court does not find that the behavior described by the plaintiff rises to the level of outrageousness required to establish a claim for intentional infliction of emotional distress. It was the plaintiff, after all, who refused to speak with her supervisor that evening, which provoked the efforts to engage in communication. Moore had a legitimate task to perform. The manner in which she undertook that task was not so "atrocious and utterly intolerable in a civilized community." *Graham*, 237 Mich. App. at 674, 604 N.W.2d at 716. Moreover, the plaintiff has not shown that she suffered *severe* emotional distress. She has not offered any evidence — other than her bruised feelings — that she encountered a compensable emotional injury.

The defendants are entitled to summary judgment on that claim, as well.

### III.

The plaintiffs have not offered sufficient evidence to establish jury-submissible issues on all the elements of their respective claims. The defendants are entitled to judgement in their favor as a matter of law.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt. #17] is **GRANTED**.

It is further **ORDERED** that the third amended complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   December 7, 2011

-34-

<u>**PROOF OF SERVICE**</u>

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 7, 2011.

s/Deborah R. Tofil
DEBORAH R. TOFIL